JOHN J. HARVEY et al., Surviving Partners Doing Business under the Name of JOHN J. HARVEY COMPANY, Claimants, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30277.)

Court of Claims, January 17, 1951.

*J. Walter Augar* for claimants.

*Nathaniel L. Goldstein, Attorney-General (Burns F. Barford* and *Lawrence H. Wagner* of counsel), for defendant.

RYAN, J.   Claimants entered into a contract with the State of New York dated May 7, 1946, and known as Contract 8491, to provide temporary housing facilities at Hamilton College,

the New York State Agricultural and Technical Institute and Colgate University. There were supplemental agreements affecting the contract. The contract was completed and the work accepted by the State on April 1, 1948. Claimants also entered into a contract with the State of New York dated September 13, 1946, and known as Contract 8647 to provide for the conversion of a part of Rhoads General Hospital for the Associated Colleges of New York into an emergency housing development. There were supplemental agreements affecting the contract. This contract was completed and the work accepted by the State, December 1, 1947. Each contract provided that the claimants should be paid cost plus percentage of cost. As provided in each contract " cost " included " 4. (h.) (II) The expense of the ' Contractor ' incident to and arising out of the performance of the work, including  *  *  *  contributions or taxes required by law based on the salaries or wages of all persons  *  *  *  engaged in the execution and accomplishment of the work ".

Claimants sue for $12,231.15 which they assert is the unpaid balance due on both contracts and, in addition, for $544.60 which sum is computed as interest on $3,844.31, an amount withheld from claimants by the State Comptroller from December 9, 1947, to April 18, 1950, and which amount the State admitted to be due as the final payment under both contracts but withheld until the claimants had supplied it with evidence of a certain payment in the sum of $1,844.80 to a subcontractor. This item of interest demanded we shall consider at a later point in this memorandum. For the moment we shall also withhold consideration of the item of $217.36 fee charged on rental of equipment used on Contract 8491 and of the further item of $1,047.75 fee claimed on prefabricated buildings incorporated in the work under Contract 8491. By subtraction this leaves for consideration the sum of $10,966.04, of which $9,583.32 concerns Contract 8647 and $1,382.72 concerns Contract 8491. These figures are again broken down into the sum of $9,304.19 cost and $279.13 fee on Contract 8647 and $1,316.87 cost and $65.85 fee on Contract 8491. The arithmetic is not in dispute between the parties. The sums admittedly unpaid by the State and for which the State disputes liability are derived from a post audit of accounts on claimants' two contracts and represent unemployment insurance tax credits which the State Comptroller finds the claimants entitled to by their experience rating under section 577 of the Labor Law.

The issue is: Should the State of New York upon the final audit of these two cost plus contracts have the benefit of the tax credits allowed to the claimants by the State's Division of Unemployment Insurance?

In upholding the constitutionality of the Unemployment Insurance Law (Labor Law, art. 18) in *Chamberlin* v. *Andrews,* (271 N. Y. 1 [1936], affd. 299 U. S. 515, rehearing denied 301 U. S. 714) Judge CRANE said (p. 9): '' The Legislature of the State * * * instead of solely taxing all the people directly * * * passed a law whereby the employers are taxed for the help of the unemployed, the sums thus paid being cast upon the public generally through the natural increase in the price of commodities.''

As a result of the great increase in employment during the war years the unemployment insurance fund grew to large proportions. By chapter 646 of the Laws of 1945, section 577 of the Labor Law was enacted to provide certain qualified employers refund credits for unemployment insurance taxes. It is unnecessary to detail the procedures for determining the credits but it should be noted that when the statute was first enacted the computation date for the refund was January first of any year and the effective date was July first next following the computation date. (L. 1945, ch. 646, § 1.) However, since the amendment by section 1 of chapter 809 of the Laws of 1947, the computation date is the first Monday in June of any year and the effective date September 30th next following the computation date. These credits are not cash refunds. The statute provides only one method for their use which is '' in payment of contributions due during the four calendar quarters following the effective date mentioned in the statute.'' (*Matter of Levy [Corsi]*, 276 App. Div. 643, 646 [1950].)

Also, '' The credit allowed was not an absolute grant of the sum specified, but only a right to offset against future payments by the employer of an amount not in excess of such credit. The purpose of the credit was to reward an employer with a good record for steady employment by giving him a specific limited reduction on sebsequent payments.'' (*Matter of Fed. Tel. & Radio Corp. [Corsi]*, 275 App. Div. 191, 193 [1949], revd. on other grounds 301 N. Y. 95.)

This is pertinent because, in this instance, the State of New York is seeking, in part at least, to benefit by tax credits as of a date antecedent to the time when they became available to the contractors' use. In a word, the State seeks to apply credits which could be utilized by claimants effectively only after

September 30, 1947, on unemployment insurance taxes which accrued in 1946 and to apply credits which could be utilized by claimants effectively only after September 30, 1948, against unemployment insurance taxes which accrued in 1947. This offsetting of future credits against antecedent liabilities is not permitted under the statute.

The theory of the legislation and its history do not support the contention that the credits are a readjustment of the contribution rate for a particular year made retroactively. Unemployment insurance taxes are cast generally upon the public through the increase in the cost of production. The distribution of the surplus is "based upon continuity of operation and experience in maintaining employment as represented by stability of payroll." (Governor's Memorandum approving L. 1945, ch. 646.) In turn the allowance of credits tends to decrease the cost of an employer's product. But that decrease occurs after the credits are utilized. Thus for Federal tax purposes the credits become taxable income for the year in which they become available to the employer in satisfaction of his liability for unemployment insurance contributions. (See Income Tax Unit Ruling No. 3770, C. B. 1945, p. 138; Prentice Hall Federal Tax Service, par. 7371.) We believe a similar ruling affects returns of State income tax.

Let us now further analyze the State Comptroller's audit of claimants' accounts as recorded and presented to us in Exhibit A. In the first place there is no report of credits based on the claimants' 1945 payroll which may have become available to claimants on July 1, 1946. Under Contract 8647 the figure of $9,304.19 cost and $279.13 fee is broken down as follows: For 1946 payrolls $3,975.35 cost and $119.26 fee. For 1947 payrolls $5,328.84 cost and $159.87 fee. The 1946 credits became available to the claimants on September 30, 1947. If utilized by the claimants in the calendar year succeeding that date and applied to reduce the contribution the claimants made for persons employed by them on the State's job a fair interpretation of the contract would mean that the cost thereof was reduced accordingly and upon such proof and such interpretation the State should have the benefit of the consequent lowered cost. Here the defendant has the affirmative burden. To find that the claimants utilized the credit of $3,975.35 for 1946 payrolls in the two months between September 30, 1947, and December 1, 1947, when the contract was ended, would be an assumption not justified by the record before us. And since the credit of $5,328.84 for the 1947 payroll was not available to claimants until Sep-

tember 30, 1948, ten months after the expiration of Contract 8647, the State would not be entitled to have that sum applied in reduction of the cost of that contract.

However, so far as Contract 8647 is concerned, neither the defendant's failure to sustain its burden with respect to the credits for the 1946 payroll nor the fact that the credits for the 1947 payroll were not available to claimants during the life of the contract need be the determining factor with respect to recovery on this element of the claimants' demand. The claimants by their own act have been estopped from recovery. There is in evidence a document known as Exhibit 6-A. This instrument which is dated December 1, 1947, and which bears the signature, duly witnessed, of one of the claimant copartners, Rodney Hamelin, after acknowledging receipt from the State of New York of the final payment due on account of Contract 8647 and releasing and discharging the State from any and all liability on account of said contract and extras, recites as follows:

" It is further agreed that the John J. Harvey Company will turn over to the State of New York any and all credits, refunds and discounts taken advantage of and received by the John J. Harvey Company from the State Division of Placement and Unemployment Insurance pursuant to Section 577 of the Labor Law and monies received by way of dividends, credits or refunds received from insurance companies.

" The amount to be turned over to the State of New York on account of credits received from the State Division of Placement and Unemployment Insurance will equal the percentage of the total credit received which the wages reimbursed by the State of New York under the contract bear to the total wages paid by the John J. Harvey Company during each year upon which credit is based.

" All such amounts to be turned over on account of credits, refunds and discounts shall be turned over within thirty days after they are received or taken advantage of."

Claimants seek to avoid the effect of this agreement on several grounds, viz.: (1) That it is an attempted transfer of credits in violation of section 577 of the Labor Law. This theory we reject. (2) That it was executed by mutual mistake of fact. In support of this we have Mr. Hamelin's testimony that he was not aware when he signed the release that the wording included a waiver of the tax credits and that he did not remember reading the release when he signed it. We find no mutual mistake of fact. (See 5 Williston on Contracts [Rev. ed.], § 1577, and

*Knight* v. *Kitchin,* 237 App. Div. 506 [1933].) (3) That claimants being in a position of trust and confidence with the State, there was fraud either actual or constructive. There is absolute failure of proof to support such a contention. (4) That there was failure of consideration. On this point the position of claimants is correct because in making payment the State of New York did no more than it was bound to do under its contract. (*McGovern* v. *City of New York,* 234 N. Y. 377, 387 [1923].) The Comptroller remitted to the claimants only the sums which were due them upon their account and no more than the State was obliged to pay. (*Schwartzreich* v. *Bauman-Basch,* 231 N. Y. 196, 203 [1921]; *O'Meara Co.* v. *National Park Bank,* 239 N. Y. 386, 399 [1925].) This was not an accord and satisfaction. (*Schuttinger* v. *Woodruff,* 259 N. Y. 212, 216 [1932].) But the writing, hereinabove quoted, was clearly a modification of the contract. As such, and since the enactment of chapter 281 of the Laws of 1936, although there was want of consideration, it is binding upon the claimants. (Personal Property Law, § 33, subd. 2; *Jaeger* v. *Canter,* 13 N. Y. S. 2d 414 [1939]; *Cohen* v. *Commercial Travelers' Mutual Acc. Assn. of America,* 47 N. Y. S. 2d 402 [1944]; *Moore* v. *Scott Stamp & Coin Co.,* 178 F. 2d 3 [C. A. 2d, 1949].) We are cognizant of the fact that subsequent to the execution and delivery of Exhibit 6-A and as late as March 30, 1948, the Comptroller proposed that the claimants enter into a further agreement with respect to an adjustment of the unemployment insurance tax credits and that they furnish a surety bond to guarantee the State the payment of all moneys that would become due thereunder and that the claimants rejected this proposal as well as a similar one with respect to Contract 8491. That the State desired such further formal agreements may indicate that its officials were not too sure of their position with respect to the offsetting of tax credits in reduction of contract costs. But neither the demand by the State that claimants execute such documents nor Mr. Hamelin's repudiation of them avoid the consequences of his act in signing Exhibit 6-A. We conclude that upon all items relating to Contract 8647 an award to claimants must be denied.

With respect to Contract 8491 wherein the work was completed April 1, 1948, credits based on the 1946 payroll which became available to the claimants on September 30, 1947, amounted to $17.84 cost and $0.89 fee and $725.92 cost and $36.30 fee. Here again it would seem that a fair interpretation of the contract terms accompanied by proper proof that these credits were utilized by the claimants to reduce the

cost of completing this contract would entitle the State to have them applied to its benefit. But there is insufficient proof in the record before us to justify such a finding. Hence the claimants are entitled to recover these amounts totaling the sum of $780.95. Also the claimants are entitled to recover the sum of $573.11 cost and $28.66 fee which are credits based on the 1947 payroll which did not become available to claimants until September 30, 1948, six months after completion of Contract 8491. Altogether we award claimants upon this item of their claim the sum of $1,382.72 and thus dispose of the subject of unemployment insurance tax credits.

We have withheld discussion of three other items. Of these, we are convinced that the deduction from the account of $217.36 fees charged on rental of equipment was arbitrary and capricious and that claimants are entitled to recover this sum. The auditor's explanation of this deduction is: '' We understand these (rental) charges were O.P.A. prices and as such we assume a profit to be included.'' There is no justification for this assumption.

We are unable to allow claimants their item of $1,047.75, fee claimed on prefabricated buildings incorporated in the work on Contract 8491. The reason for denial of this item is the provision in the original contract, Paragraph 4 H (V), which by supplemental agreement No. 6, dated August 13, 1947, was made to apply to prefabricated buildings. Thereby, the value of such buildings was excluded from cost to the contractors.

There remains the question of the right of the claimants to recover the item of $544.60 detailed in the early part of this memorandum. We find nothing to warrant a finding that the withholding of payment of the amount upon which this interest is computed was arbitrary or unreasonable. As we have seen there was a fair difference of opinion as to the interpretation of the contract and an extended period of time during which the accounts were subject to audit and during which there were negotiations and correspondence between the parties looking toward a final settlement. To hold that the claimants were entitled to their final payment of $3,844.31 on December 9, 1947, would conflict with the holding which we hereby make, and which we believe to be the proper one, that the limitation of time for claimants to file their claim did not begin to run until April 18, 1950. (*Edlux Constr. Corp.* v. *State of New York,* 252 App. Div. 373 [1937], affd. 277 N. Y. 635.)