**Ermin MOSCHETTA et al., Plaintiffs,**

**v.**

**James G. CROSS et al., Defendants.**

**Civ. A. No. 686–60.**

United States District Court
District of Columbia.

Nov. 4, 1964.

Sheldon E. Bernstein, Washington, D. C., for Mozart G. Ratner.

Abraham J. Harris, Washington, D. C., for Bakery and Confectionery Workers International Union of America.

TAMM, District Judge.

By an order dated November 6, 1962, this Court entered judgment in behalf of Mozart G. Ratner for counsel fees and expenses in the amount of $54,884.91, on account of work performed and disbursements incurred by Mr. Ratner and attorneys associated with him in the above-entitled case. The Court, in its order of November 6, 1962, provided that the payment of this judgment was to be effected against the named plaintiffs and the entire membership of the Bakery and Confectionery Workers International Union of America, jointly and severally. The Bakery and Confectionery Workers International Union of America appealed from this Court's order.

The United States Court of Appeals for this Circuit, in an opinion dated June 11, 1964, Bakery and Confectionery Workers International Union of America v. Ratner, 118 U.S.App.D.C. 269, 335 F. 2d 691 reversed this Court's ruling insofar as it applied to the Union and remanded the case to this Court with directions to evaluate the services rendered by Mr. Ratner "in terms of value of the benefits afforded to the International and its membership." This remand directed that since the liability of the International and its membership did not here rest upon a contract, "[q]uantum meruit provides the rule which, we are satisfied, must be applied in an ascertainment of that value."

Pursuant to the remand from the Court of Appeals, this Court has conducted a hearing at which counsel for Mr. Ratner and the International Union were present and argued their respective positions, and counsel have filed memoranda stating their positions in the present situation.

The proceedings in this case have been lengthy and have extended over several years. The excellent opinion of Judge Danaher in the Court of Appeals opinion of June 11, 1964, succinctly outlines the substantive history of this litigation. Mr. Ratner's activities as counsel first for the five plaintiffs who initiated this class

action on behalf of the entire membership of the International Union were originally predicated upon a contract of employment, the terms of which are set forth in detail in the pleadings in the case. Prior to Mr. Ratner's motion for assessment of attorneys fees, which motion is the subject of the present proceeding, Mr. Ratner and his associates had been paid some $70,000.00 in fees and expenses. The present proceedings relate, then, to but the terminal period of Mr. Ratner's professional services to the named plaintiffs. This situation, consequently, creates a rather difficult problem, because the Court in evaluating the "terms of value of the benefits afforded to the International and its membership" must view the case in its entirety. Steps taken by Mr. Ratner, through his direction or by Court action, which were initiated in the period for which attorneys fees had previously been paid, of necessity, establish a foundation, a cause, a necessity, or resulted in further action during the period between April 19, 1961 and January, 1962. The benefits accruing to the International Union and its membership must be appraised and evaluated upon the basis of the total impact of Mr. Ratner's continued action from the beginning of his association with the case to the termination of his employment.

In this Court's order of November 6, 1962, the Court specifically pointed out, "[t]hat this suit was initiated and prosecuted in the interest of the Union membership as a whole and such fruits as flowed from the proceedings herein were for the benefit of the Union and all its members; namely, consisting of:

"(a) A court-ordered convention conducted in accordance with the lawful provisions of the Union's Constitution;

"(b) Court orders protecting intra-Union pre-convention political activity from illegal officer restraint and reprisal; and

"(c) Court proceedings to enforce this Court's orders, as aforesaid."

As Judge Danaher's opinion points out, the action was originally initiated to secure an accounting from the defendant officers of the use of Union funds, to obtain a restitution of misappropriated funds, an injunction against further misappropriation and diversion of funds of the Union, for an order against the defendant officers to restrain them from penalizing and coercing the plaintiffs and other persons to prevent them from prosecuting the action, to obtain court supervision of the financial practices of the Union, and to compel a membership referendum in accordance with the constitution of the Union preliminary to calling a national convention. It is readily observed that the suit sought in behalf of the entire Union membership to correct abuses existing in the management of the Union by its chief officer. The objectives of the lawsuit, with the exception of the accounting action which is still pending, were accomplished by, through, and as a result of the present action. The defendant James G. Cross lost control of the Union; he was successfully prosecuted for mal-administration of the Union and misappropriation of funds. A convention was held, and the convention resulted in the election of a slate of officers at that convention which was opposed to the then officers and which was favorable to the plaintiffs' bringing the class action. As a matter of fact, the "Journal," the official publication of the Union, in describing the January 1962 convention, stated:

"Never before has any rank-and-file organization like the Local Unions Reunification Committee been successful in a fight to remove from office entrenched international union officials.

"The BCW Convention has proved that rank-and-file members determined to see their international union properly run can do the job themselves, within their union, unassisted by federal law or any other outside influences, and can, by their own determination and will take control of their union and of its con-

vention processes and make it work for them."

The references are, of course, to the convention effectuated as a result of the Court order in this action.

■ The Court concludes that in attempting to measure the quantum meruit value of the case and Mr. Ratner's participation therein in terms of value to the entire Union membership, the Court must appraise first the over-all value of Mr. Ratner's services to the Union and then deduct therefrom the counsel fees already paid to Mr. Ratner.

The economic value of Union membership is so universally recognized that it is unnecessary for the Court to dwell upon it. Economic gains effected by strong, honest labor unions in behalf of their membership in the past 30 years are ample proof of the necessity for and value of union membership. To be effective as a bargaining agent, to justify the prestige of leadership, and to effectuate the fundamental purposes of union organizations, a union must be honestly administered in behalf of the entire membership. Misuse of union funds by union officers, misconduct so flagrant as to be the subject of common knowledge, in short, any personal or official action by union officials which brings discredit upon the union reflects materially not only upon the effectiveness of union organizations but the value of membership in the union. A discredited union loses prestige which is essential for substantive accomplishment, with resulting loss of membership value to the individual members. The value to members of union affiliation diminishes as the union's reputation and effectiveness decline.

The International Union in the present case was, at the time of the initiation of this action, a thoroughly discredited union. The International's principal officer was the subject of such unfavorable newspaper and other publicity that a shadow of doubt and suspicion was cast over the entire union organization. The court action accomplished through the present case resulted in a purging of the

offending officer and restoration of the Union to the control of its members, with a resulting re-establishment of the Union as a reputable representative of its members.

What, then, is the dollar value of this accomplishment to the members of the Union, expressed in terms of compensation, for the professional services of the attorneys who planned and executed the legal aspects of this rehabilitation?

As Judge Danaher suggests in his opinion of June 11, 1964, "compensation at the rates provided in the retainer agreement with the class plaintiffs may be considered as some evidence of the value which the appellee [Ratner] initially placed upon his own services." Judge Danaher goes further, however, in pointing out that certain complications which ultimately developed could not have been foreseen at the time the contract for attorneys' services was consummated.

■ The Bakery and Confectionery Workers International Union of America is a substantial union. Its approximate membership in 1960 was 71,394. In 1961, the approximate membership had dropped to 66,454, but in 1962 the membership had again risen to a figure of 71,181 members. In 1963, membership was reported to be 66,326, which figure is the most recent one available to the Court. The Court has reviewed miscellaneous figures furnished to the Court showing the gross assets of the Union. The Court believes that the Welfare Fund of the Union and the Pension Fund and the Officers Pension Plan do not properly constitute assets of the Union itself when considering the Union's financial status. The net worth of the International Union, excluding the funds enumerated in the previous sentence, varied from a low of $3,150,421 in 1962 to a high of $4,834,767 in 1959. Members of the Union pay dues to the International of $1.25 per month, or a total of $15.00 per year.

Considering the question of the value of the services of Mr. Ratner to the International Union members from another approach, this Court observes that the monthly dues paid by Union members to the International has averaged $86,048.75 per month for the last several years and that these dues represent an average income to the International of $1,032,585 a year. A measure of the value of the Union to its own members is certainly found in the amount of money which the members pay into the International in order to remain members of that Union.

The average net worth of the Union, as shown with reference only to Union funds (excluding Welfare Fund, Pension Fund, etc.), is $3,641,851.20. The Court believes, however, that this figure is not as accurate an index of the value of membership in the Union as is the amount actually periodically paid into the Union as members' dues. The Court, in discussing the value of union membership, refers, of course, to membership in an honestly and efficiently administered union operated through leadership selected by democratic process. In this context, the Court considers the value of union membership in this International Union upon a comparative basis of conditions existing before the initiation of the present legal action and conditions existing at the time of the filing of the present action for final fee by Mr. Ratner.

The intangible benefits accruing to the Union members by this action are difficult to evaluate in terms of dollar value. The tangible benefits, referred to heretofore in general terms, blend into and merge with the intangibles in such measure as to make distinction most difficult. For example, the exposure and elimination of substantial misuse of Union funds not only resulted in protection of the Union funds from further misuse but also restored the confidence of the members, and even of the public, in the Union's subsequent operation. The ultimate value of such action to the Union members is obvious.

■ Directing its attention specifically to the amount of money a Union member pays for membership in the International, the Court concludes that this is the most accurate measure of the value of membership in a responsible un-

ion. As heretofore indicated, the members of the International Union pay into their Union an annual average of $1,032,-585 in dues. Certainly some reasonable percentage of this figure is a valid measure of the value of professional services rendered in evicting a dishonest administration and restoring the Union to the control of its members. After reviewing all of the financial data available, the Court concludes that 12½% of the International's average annual income from dues is a fair, reasonable and realistic measure of the value of the services rendered by Mr. Ratner and his associates throughout their entire participation in this case on a quantum meruit basis. This figure totals $129,-073.13. This figure is within 8% of the fee established in the employment agreement under which the named plaintiffs originally retained Mr. Ratner and his associates. The record discloses, however, that $70,000 has already been paid to Mr. Ratner and his associates for professional services rendered in this case. The Court deducts this amount from its total figure of $129,073.13 and concludes that there is owing to Mr. Ratner and his associates on this same quantum meruit basis a balance of $59,073.13 in legal fees, plus the necessary and proper costs heretofore included in earlier itemized statements of account.

As provided in the Court's order of November 6, 1962, the named plaintiffs are obligated under this judgment in the amount of $54,884.91 for legal fees and expenses, and the entire membership of the Bakery and Confectionery Workers International Union of America and the defendant Bakery and Confectionery Workers International Union of America, jointly and severally, are liable in the amount of $59,073.13, plus those expense items included in the final statement of account rendered by Mr. Ratner on February 7, 1962.

The judgment of $54,884.91 enumerated above as being an obligation of the named plaintiffs is, of course, included in the total figure of $59,073.13 assessed against the Union members.